**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LESLIE MCMANAMY, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 14-1463 |
| | ) Judge Nora Barry Fischer |
| SELECT MEDICAL CORPORATION and | ) |
| RICHARD COSGROVE, individually, | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

**I.    Introduction**

This action involves allegations of employment discrimination by Leslie McManamy ("Plaintiff") against her former employer, Select Medical Corporation, and her former supervisor, Richard Cosgrove (collectively, "Defendants"). Specifically, Plaintiff asserts a claim for age discrimination against Select under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1) and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 955(a); and a parallel claim for aiding and abetting age discrimination against Cosgrove, individually, under the PHRA.[1]

Defendants filed a motion for summary judgment, along with a supporting brief and a concise statement of material facts ("CSMF"), on April 8, 2016. (ECF Nos. 51-54). Plaintiff filed a brief in opposition to Defendants' motion, along with a counterstatement of material facts, on May 26, 2016. (ECF Nos. 61-63). Defendants filed a reply brief and response to Plaintiff's counterstatement of material facts on June 17, 2016. (ECF Nos. 68-69). The Court heard oral argument on the motion on July 5, 2016, at which it granted the oral request of Plaintiff's counsel to file an amended counterstatement of material facts. (ECF No. 73). The same was filed

---

[1] Plaintiff initially alleged a claim for sex discrimination, as well. This claim has been voluntarily dismissed. (ECF No. 71).

on August 5, 2016, with a response from Defendants following on September 6, 2016.[2] (ECF

Nos. 75-76). With briefing complete and the factual record fully developed, Defendants' motion

is ripe for disposition. For the following reasons, the motion will be denied.

## II. Statement of Material Facts[3]

Select Specialty Hospital – Laurel Highlands is a long-term acute care hospital in

Latrobe, Pennsylvania, that provides a "bridge" for critically ill patients between their acute

hospitalization and the next stage of care, which is typically a nursing home. (ECF No. 53 at ¶ 8).

Plaintiff, who at all relevant times was 54 years old, began working as a registered nurse for

Select in 2005, and over the next several years, she worked as both a nurse and case manager

with the company. (*Id.* at ¶ 1). In 2013, Select decided to reduce its case management staff,

which then consisted of just Plaintiff and the Director of Case Management, Tammy Jakub. (*Id.*

at ¶¶ 6-7, 11-14). Since Jakub had more seniority, she was retained in the case management

position full-time, while Plaintiff was told that her hours would be cut. (*Id.*). When Plaintiff

found out, she "made it very clear that [she] was disappointed" because "[she] really liked [her]

job, and [she] had wanted to stay there." (Pl.'s Dep. at 50:11-13; ECF No. 72-1).

In June 2013, Plaintiff successfully bid on a vacant clinical liaison position with Select.

(ECF No. 53 at ¶ 16). According to Plaintiff, a clinical liaison's duties include going to the

---

[2] As Defendants argue in their most recent filing (ECF No. 76), Plaintiff's amended counterstatement of material facts fails to cure many of the deficiencies in her original filing. For example, in response to numerous paragraphs, Plaintiff states that she "is without knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph, the same are denied and strict proof thereof is demanded at the time of trial." (ECF No. 75 at ¶ 111). However, "[u]nder long-established precedent, such a response does not create a material dispute of fact." *Carpenters Combined Funds ex rel. Klein v. Klingman*, No. 2:10-CV-63, 2011 WL 92083, at *3 (W.D. Pa. Jan. 11, 2011) (citing *Houghton v. Am. Guar. Life Ins. Co.*, 692 F.2d 289, 295 (3d Cir. 1982)). In other instances, Plaintiff simply fails to cite evidence in the record to dispute Defendants' factual statements. Accordingly, the Court will deem those facts admitted for purposes of ruling on Defendants' motion. *See Aubrey v. Sanders*, CA No. 07-0137, 2008 WL 4443826, at *1 (W.D. Pa. Sept. 26, 2008).

[3] Unless otherwise noted, the facts herein are undisputed, having been drawn from the Defendants' CSMF, Plaintiff's amended counterstatement of material facts, and Defendants' response thereto, along with the attached exhibits. (ECF Nos. 62, 75, 76).

hospitals within a designated region (there are three regions, with each of Select's clinical liaisons responsible for one), reviewing a patient's medical information, speaking with the physicians caring for the patient, and determining whether the patient is eligible for admission to a long-term acute care hospital. (*Id.* at ¶ 27). Such contacts cannot occur, however, until a patient has been referred for long-term acute care. (*Id.* at ¶ 31). Once a referral occurs, the hospital case management staff sets up meetings between the referred patient's family and clinical liaisons from various long-term acute care facilities in the area. (*Id.* at ¶ 32). The facility that has the first meeting with a patient's family has an advantage in turning the referral into an admission into its facility. (*Id.* at ¶ 33). It is thus important for clinical liaisons to develop strong relationships with case managers at the hospitals within their regions in order to become the first liaison to secure a meeting with a patient's family. (*Id.* at ¶ 34). The clinical liaison position also involves marketing the Select to physicians and the families of critically ill patients. (*Id.* at ¶ 29).

At some point prior to accepting the position, Plaintiff had a conversation with Jakub, in which Jakub asked her, "'are you sure you want do this, because it's a difficult job.'" (Pl.'s Dep. at 61:4-6; ECF No. 72-1). Plaintiff responded that "[her] first choice was case management but . . . [she] needed the full-time position." (*Id.* at 61:6-8).

Plaintiff accepted the clinical liaison position in June 2013. However, she continued to work as a case manager for some time thereafter because Jakub was on medical leave. (ECF No. 53 at ¶ 22-24). At some point during that period of time, Plaintiff told Select's CEO, Laurie Kozorosky, that "of course, case management was [her] first choice but that [she] was completely invested in the company" and "whatever job [she] did [she] would do the best of [her] ability." (Pl.'s Dep. at 76:12-16; ECF No. 72-1). Plaintiff also admits that she told Kozorosky that the clinical liaison position "was not [her] dream job." (*Id.* at 17-18).

Plaintiff fully transitioned to the clinical liaison position in September 2013 when Jakub returned from medical leave. (ECF No. 53 at ¶¶ 22-24, 40). At the time, her supervisor was the Director of Marketing, Mike Podolinski. (*Id.* at ¶ 44). According to Select's Policies and Procedures, "[n]ewly hired or rehired employees serve a 90-day introductory period to assist them in learning the responsibilities of their new position and in meeting the applicable standards of work performance and behavior." (Defs.' Ex. H, ECF No. 72-15). "At the end of the introductory period, supervisors review performance with the new employee and decide whether to change employee classification to regular employee status." (*Id.*). Select considered Plaintiff to be subject to the 90-day review period because she was transitioning to a new position.

Cosgrove replaced Podolinski as Plaintiff's supervisor when he was hired by Select in October 2013. (ECF No. 53 at ¶ 46.). He met Plaintiff for the first time on October 30, 2013, which was his first day. During that meeting, Kosorosky introduced Plaintiff to Cosgrove and said something like, "[T]his is our newest liaison, this was not her dream job, but she took the position." (*Id.* ¶ 71). As Cosgrove recalled the encounter, it was Plaintiff who said that the clinical liaison position was not her dream job. (Cosgrove Dep. at 15: 9-13; ECF No. 72-3). In any event, Plaintiff responded, "[T]his might not have been my dream job, but any job I do I do to the best of my ability, and I will certainly do that with this job as well." (ECF No. 53 at ¶ 71).

Cosgrove testified that, early on in his tenure, while he was riding with Plaintiff to visit a hospital in her region, she reiterated that the clinical liaison position "isn't [her] dream job," that she was "doing it for the pay check," and that she would like to return to her prior position as case manager. (*Id.* at ¶ 78). Plaintiff denies ever having made such a statement to Cosgrove. She also does not recall having a conversation with Cosgrove regarding her level of commitment to the job, though she "can't swear" that they "didn't discuss it at some point." (Pl.'s Dep. at

107:22-24; ECF No. 72-1). She does not dispute, however, that at some point, she asked Kozorosky to "consider" her "if something else" became available. (*Id.* at 146:23-25).

In November 2013, Cosgrove had another encounter with Plaintiff that caught his attention. During a meeting with Select's marketing staff, Kozorosky asked Plaintiff to contact a physician with Excela Hospital System regarding a patient, and Plaintiff refused, believing that it would violate Excela's rules against marketing directly to physicians. (ECF No. 53 at ¶ 83). Although Cosgrove admitted in his deposition that Plaintiff's interpretation of the policy may have technically been correct, Cosgrove nonetheless considered Plaintiff's refusal indicative of "a lack of positive energy and a willingness to break down barriers." (Cosgrove Dep. at 30:11-12; ECF No. 72-3). Cosgrove clarified, though, that in this particular instance, his "concern was more about how in a public forum we respond to each other." (*Id.* at 32:20-22). Following the meeting, Cosgrove met privately with Plaintiff to discuss her demeanor in responding to Kozorosky's request. (ECF No. 53 at ¶ 86).

This incident and the follow-up meeting are referenced in a "Coaching Form" prepared by Cosgrove and dated November 25, 2013.[4] (Defs.' Ex. I; ECF No. 72-16). In the form, Cosgrove wrote that "Plaintiff did not make a terrific first impression with [him]. She has made it clear on 2-3 occasion's [sic] that his [sic] job was not her dream job and she only took it because her case manager job was eliminated." (*Id.*). He also noted that "[a]fter discussing [the incident at the marketing meeting] with her, I understand that she had some concerns with following referring hospitals protocols. I coached her to next time a) Ask for clarification on

---

[4] Cosgrove testified that he prepared this form "shortly after" his meeting with Plaintiff regarding the incident at the marketing meeting, but he could not recall the specific date. (Cosgrove Dep. at 57:7; ECF No. 72-4). The purpose of the form is also somewhat unclear. Cosgrove testified that Plaintiff never received a copy of the form; it was simply his "coaching notes." (*Id.* at 67:9-12). As he put it, "It wasn't a formal – you know, it's not like you are being written up or something that it was formal human resource – you know, it was simply a Coaching Form of notes and how, you know, I can help you be successful." (*Id.* at 67:14-18). He added, "It's a standard form used internally so that, again, you can help position people to be successful, and it's something we can reference back to when we sit down and talk again." (*Id.* at 70:1-4).

expectations and purpose. B) If you have a concern about following through on an action as instructed, ask if it can be discussed personally after the meeting. Do not show such direct disregard for a supervisor's instruction publically." (*Id.*). He ended the memo by noting that he "asked [Plaintiff] to give serious consideration and thought if she really would like to continue in the Clinical Liaison role. I need her to have her 'head in the game.' If only doing it because 'I need a job', then it will show to our referral sources." (*Id.*).

Plaintiff's 90-day introductory period ended on December 7, 2013. (ECF No. 52 at ¶ 110). Thereafter, Cosgrove, Kozorosky, and a representative from Select's human resources department, Leslie Mock, met to discuss Plaintiff's performance in her new role. (*Id.* at ¶ 111). Kozorosky shared her concerns about Plaintiff with Cosgrove, particularly in regards to her willingness to follow-up with case managers about potential referrals. (*Id.* at ¶ 112).

Eventually, Cosgrove completed a 90-day performance appraisal form. (Defs.' Ex. J; ECF No. 72-17). The criteria on which an employee is assessed in the appraisal form are subjective. (Cosgrove Dep. at 79:16; 80:22; ECF No. 72-4). On December 16, 2013, Cosgrove met with Plaintiff to discuss her evaluation. (ECF No. 52 at ¶ 113). He rated her unsatisfactory in the following areas: "We treat others as they would like to be treated," "We are results oriented and achieve our objectives," "We are resourceful at overcoming obstacles," "Demonstrates ICARE Standard for Personal Interaction (Patients, Families, Physicians, Coworkers, and all internal/external customers)," and "Application of Sincere Effort to Learn Job and Job Skills." (Defs.' Ex. J at 1; ECF No. 72-17). Her overall rating was unsatisfactory, and she was considered to have not successfully completed the introductory period. (*Id.*). In an addendum to the form, Cosgrove wrote, "I would like Leslie to show creativity, desire, and initiate actions to push through obstacles." (*Id.* at 2). He added, "[a]s a Clinical Liaison, she needs to be a positive,

energetic, caring, and empathetic patient advocate. It is very important for a Clinical Liaison to exhibit these traits upon every encounter with referral sources, families, and coworkers." (*Id.*). Cosgrove also wrote that he questioned Plaintiff's commitment because she had "made it known on multiple occasions that she was not initially interested in this position, only took it because she needs a job, and would like to go back to a case management position as soon as one presents." (*Id.*). Finally, Cosgrove noted that Plaintiff needed to improve her communications skills because she "can be abrupt in her response/reactions." (*Id.*).

After reading over the evaluation with Cosgrove, Plaintiff became upset, and she does not remember the details of the meeting. (ECF No. 53 at ¶ 119). She does recall, however, that Cosgrove asked her whether she "wanted to stay in the position, and [she] said, yes." (Pl.'s Dep. at 122:11-13; ECF No. 72-1). Cosgrove testified that he did, in fact, "ask[] [Plaintiff] if she want[ed] the job and to get back to [him] . . . ." (Cosgrove Dep. at 127:11-12; ECF No. 72-5). He testified that he "do[es not] recall" whether she answered him, but "[his] anticipation was that [they] would have a discussion after that meeting" so Plaintiff could "collect her thoughts and discuss it." (*Id.* at 127:17-19). Later in his deposition, however, Cosgrove testified that Plaintiff never responded to his inquiry, and he admitted that he never reconvened a meeting to give her the opportunity to do so. (*Id.* at 148:21-23; 150:17).

After her evaluation, Plaintiff called off sick the rest of the week. (ECF No. 53 at ¶ 130). She returned to work on December 23, 2013, and covered case management duties for Jakub, who was on vacation. (*Id.* at ¶ 132). The following week, Plaintiff returned to her clinical liaison duties. Meanwhile, Cosgrove, Kozorosky, Mock, and another human resources representative, Barbara Foster, had several meetings to discuss Plaintiff's status. (*Id.* at ¶¶ 133, 135).

On January 3, 2014, Cosgrove informed Plaintiff that she was being terminated because

she "had not proven to be a good fit for the position." (Pl.'s Dep. at 137: 20-22; ECF No. 72-1).

Cosgrove testified that he made the decision to terminate Plaintiff "in conjunction with the

Human Resources offices and [Kozorosky]." (Cosgrove Dep. at 6:1-2; ECF No. 72-3). Later in

his deposition, he clarified that "[t]he ultimate decision . . . rested on [him]," though he is "sure

[Kozorosky] agreed" and that the decision could not be made "without her approving it." (*Id.* at

151:3, 158:14, 158:17). According to Cosgrove, the decision was made because Plaintiff failed

to display a "positive energy," which he viewed as essential to the position, and failed to "break

down barriers" in developing relationships with referral sources at hospitals. (*Id.* at 4-6). He also

testified that he questioned Plaintiff's "commitment to the position" because of her comments

about it not being her "dream job" and about wanting to return to a case manager position if one

became available. (*Id.* at 18:24). As the only example of Plaintiff's failure to "break down

barriers," Cosgrove cited an incident involving a physician named Dr. Kumar. (ECF No. 53 at ¶

94). According to Cosgrove, Plaintiff had claimed that Dr. Kumar "doesn't like Select" and

"[will] never give [Select] patients." (*Id.*). Cosgrove claims that Plaintiff never attempted to

overcome that "barrier." However, he testified that he was eventually able to arrange a meeting

with Dr. Kumar, who told him that he would "gladly work with" Select. (*Id.* at ¶ 95). Cosgrove

further testified that his efforts eventually led Dr. Kumar to refer patients to Select. (*Id.*). Plaintiff

disputes this, as she claims that she "made numerous efforts to work with Dr. Kumar" and asked

him whether "there were any barriers regarding our working together." (Pl.'s Ex. 1 at ¶ 3; ECF

No. 62-1). Dr. Kumar always responded that there were no barriers and promised that he would

give Select referrals. (*Id.* at ¶ 3). Nevertheless, he never did so. (*Id.*). Regarding the specific

comment Cosgrove attributed to her, Plaintiff says that she "never told Mr. Cosgrove that Dr.

Kumar told [her] that he would never work with Select." (*Id.* at ¶ 4).

For her part, Kozorosky testified that she made the "ultimate decision" to terminate Plaintiff "[a]fter receiving information from Mr. Cosgrove" and reviewing Plaintiff's performance with the human resources department. (Kozorosky Dep. at 4:13-17; ECF No. 72-8). Kozorosky explained that Plaintiff was terminated because "[she] did not display a positive attitude towards being a clinical liaison while she was performing within the first 90 days of her performance which were probationary days and did not display or verbalize the desire to work with Mr. Cosgrove to improve her performance when her 90-day probation period ended and her deficiencies were presented to her." (*Id.* at 4:22-25 – 5:1-3).

It is undisputed that, prior to her termination, Plaintiff achieved the sales goals that were set for her, which were higher than those of her counterparts. (ECF No. 75 at ¶ 187). Cosgrove testified that Plaintiff was "doing well in her territory . . . in terms of achieving the goals that [were] set for those hospitals." (*Id.* at ¶ 179). Kozorosky agreed that Plaintiff met expectations in regards to the number of admissions she brought in. (*Id.* at ¶ 181). Nevertheless, Defendants have not taken the position "that Plaintiff was terminated based upon her performance in relation to admissions goals." (ECF No. 69 at ¶ 179).

III. **Standard of Review**

Summary judgment is appropriately entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (citation omitted). In deciding a motion for summary judgment, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. *See Montone v. City of Jersey City, et al.*, 709 F.3d 181 (3d Cir. 2013). Rather, the Court is only to determine whether the evidence of record is

such that a reasonable jury could return a verdict for the non-moving party. *Id.* In evaluating the

evidence, the Court must interpret the facts in the light most favorable to the non-moving party,

and draw all reasonable inferences in favor of the non-movant. *Watson v. Abington Twp.*, 478 F.

3d 144, 147 (3d Cir. 2007).

## IV.    Discussion

The parties agree that Plaintiff's age discrimination claim must be evaluated under the

familiar burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S.

792 (1973).[5] Under *McDonnell-Douglas*, Plaintiff has the initial burden of establishing a *prima*

*facie* case of discrimination. *See Burton*, 707 F.3d at 425-26. Defendants do not dispute that she

has done so. (ECF No. 52 at 4).

The burden thus shifts to Select "to offer a legitimate, nondiscriminatory reason" for

terminating Plaintiff. *Burton*, 707 F.3d at 425-26. To that end, Select argues that "[t]he record is

replete with testimony supporting the perception of the decisionmakers, Lauri Kozorosky and

Richard Cosgrove, that Plaintiff was not well suited for the Clinical Liaison ("CL") position."

(ECF No. 52 at 4). In particular, Cosgrove testified that Plaintiff was terminated because she did

not display a "positive energy"[6] and failed to work to "break down barriers" and find "new ways

---

[5] "There is no need to differentiate between [Plaintiff's] ADEA and PHRA claims because, for our purposes, the same analysis is used for both." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) (citations omitted).

[6] Plaintiff contends in a footnote that the phrase "positive energy" amounts to "direct evidence" of age discrimination, though, aside from citing a single case, she does not offer much in the way of analysis on this point. (ECF No. 63 at 3 n.3). Direct evidence is evidence that is "sufficient to allow the jury to find that 'the decision makers placed substantial negative reliance on the plaintiff's age in reaching their decision to fire [her].'" *Fakete v. Aetna*, 308 F.3d 335, 338 (3d Cir. 2002) (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)). Ambiguous statements, however, cannot amount to direct evidence of discrimination. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010). The phrase "positive energy," as used by Cosgrove, is, at most, ambiguous. A few courts have held that similar phraseology is nothing more than a covert way of stereotyping a plaintiff based on age. *See, e.g.*, *Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1396, 1411 (D.N.J. 1996). Other courts, however, have held that such a phrase, when considered in context, is not suggestive of age discrimination. *See, e.g.*, *Thrower v. Home Depot, Inc.*, 2005 WL 2367763, at \*9 (W.D. Pa. Sept. 27, 2005) ("The fact of the matter is that, while the energy or fire exhibited by a person serving in a managerial role may be impacted

to develop referral sources." (Cosgrove Dep. at 5:7-12; ECF No. 72-2). For her part, Kozorosky testified that Plaintiff was terminated because she "did not display a positive attitude towards being a clinical liaison while she was performing within the first 90 days of her performance which were probationary days and did not display or verbalize the desire to work with Mr. Cosgrove to improve her performance when her 90-day probation period ended and her deficiencies were presented to her." (Kozorsky Dep. at 4:22-25 – 5:1-3). This evidence, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763.

Consequently, the focus becomes whether Plaintiff has produced sufficient evidence from which a jury could reasonably conclude that the reasons offered by Select amount to pretext, and that the real reason was discriminatory. *Burton*, 707 F.3d at 425-26. To create a genuine issue of material fact as to whether the proffered reasons are pretextual, Plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Select's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Select's] action." *Fuentes v. Perski*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). To succeed under the first *Fuentes* prong, as Plaintiff is attempting to do, she "cannot simply show that the [Select's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [Select], not whether [Select] is wise, shrewd, prudent, or competent." *Id.* at 765. Rather, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

---

by age, it may just as easily be the product of the amount of effort exerted or personality traits."); *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 31 (D.C. Cir. 1997) ("The context in which the statements [regarding the plaintiff's stubbornness and lack of creativity] were made—detailed evaluations of [the plaintiff's] performance of management tasks one would expect to require creativity and flexibility—indicates they were based not on stereotypes but on objective assessments of job performance."). Thus, the Court finds it more appropriate to assess Plaintiff's claim under the *McDonnell-Douglas* framework.

contradictions in [Select's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence[.]'" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). There must, in other words, be some evidence that calls into question "the core facts put forward by [Select] as the legitimate reason for its decision." *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005). This is a lofty burden, *Fuentes*, 32 F.3d at 764, but where, as here, an employer relies on entirely subjective criteria to evaluate its employees, "'careful analysis of possible impermissible motivations is warranted,'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003)).

Plaintiff argues that the "first major contradiction or inconsistency . . . starts with who made the decision to terminate [her]." (ECF No. 63 at 4). To be sure, there is inconsistent testimony as to who decided to terminate Plaintiff's employment. Cosgrove testified that the ultimate decision rested with him, while Kozorosky testified that she made the decision.

Nevertheless, as Chief Judge Conti has explained when faced with similar facts, "[t]his evidence, by itself, is not sufficient to preclude summary judgment in favor of defendants because it does not show weaknesses or implausibilities in defendants' proffered legitimate nondiscriminatory reason for firing plaintiff." *DeCecco v. UPMC*, 3 F. Supp. 3d 337, 372-73 (W.D. Pa. 2014). In *DeCecco*, the defendant identified three individuals as final decisionmakers. *Id.* at 372. Two of those individuals, Medved and Devine, testified that the three of them, together, made the decision to terminate the plaintiff, but the third individual, Roth, said that she alone made the decision. *Id.* In rejecting the plaintiff's argument that this inconsistency was enough to show pretext, Chief Judge Conti contrasted the facts before her with those in three cases in which there was evidence that the defendants had tried to hide the real decisionmaker in

a way suggestive of pretext. *Id.* at 371-73 (citing *Reeves*, 530 U.S. at 151–52; *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 285 (3d Cir. 2000); *Sabbrese v. Lowe's Home Centers*, 320 F. Supp. 2d 311, 326 (W.D. Pa. 2004)). As she explained:

> Unlike [in *Reeves*, *Farrell*, and *Sabbrese*], the facts of this case do not show that defendants hid the identity of the final decisionmaker in a way that is probative of pretext. In *Reeves*, the defendant-employer concealed that the decisionmaker was the same person who made various age-biased comments about the plaintiff. In *Farrell*, the plaintiff accused the defendant-employer of concealing that the final decisionmaker was the director who made sexual advances toward her, and in *Sabbrese*, the defendant-employer failed to identify any decisionmakers. These decisions are clearly distinguishable from the facts of this case. Although plaintiff accuses Roth of making age-biased comments, Roth, unlike the director in *Reeves*, took full responsibility for the decision to fire plaintiff. In contrast to the defendant-employer in *Farrell*, defendants in this case did not attempt to conceal a decisionmaker who engaged in misconduct towards the plaintiff, and unlike the defendant-employer in *Sabbrese* that did not identify any decisionmakers, defendants in this case identified three final decisionmakers that were all in agreement that plaintiff must be fired.

*Id.* at 373.

Here, as in *DeCecco*, Select has stated without equivocation that both Cosgrove and Kozorosky made the decision to terminate Plaintiff. While there is some question as to the timing and extent of their communications regarding the decision, there is no dispute that they did discuss the matter and agreed that she needed to be terminated. (*Id.* at ¶ 135; ECF No. 63 at 6 (wherein Plaintiff states that "[t]here is no dispute . . . that there was some sort of constultation between Cosgrove and Kozorosky about this termination")). There is also no dispute that they met prior to Plaintiff's 90-day evaluation to discuss her performance and that Kozorosky shared her concerns with Cosgrove. (ECF No. 53 at ¶¶ 111, 112). Finally, there is no dispute that unlike in the cases discussed in *DeCecco*, neither Cosgrove nor Kozorosky has ever tried to hide or downplay his or her involvement in the decision. *Cf. Roehrig v. W.G. Tomko, Inc.*, 2016 WL 2755177, at *3 (W.D. Pa. May 12, 2016) (denying summary judgment where Defendant "fail[ed]

to identify who actually decided to terminate Plaintiff"). Therefore, the Court concludes that the inconsistency in the testimony as to who was actually the ultimate decisionmaker is not, by itself, fatal to Defendants' motion for summary judgment.

Plaintiff also argues that Cosgrove and Kozorosky offered different, contradictory reasons for terminating her. The Court does not agree, however, that their reasons differed in any meaningful way, let alone that their reasons were contradictory. True enough, they used different language to describe why Plaintiff was terminated. But, in substance their reasons were the same: Plaintiff did not display the type of "positive attitude," as Kozosorky put it, or "positive energy," as Cosgrove put it, that was necessary for the job. They also both testified that she displayed a lack of commitment to the position. While Plaintiff contends that Cosgrove and Kozorosky contradicted each other about whether anything she did after her 90-day evaluation contributed to her termination, such an interpretation ignores key parts of what these witnesses actually stated in their depositions. When asked what changed between the date of Plaintiff's 90-day review and the date she was fired, Cosgrove testified that "one thing" that changed was "the non response to [his] direct question of, 'do you want the job or not? Do you really want to do this?'" (Cosgrove Dep. at 148:16-23). Cosgrove testified that her failure to answer his question "sen[t] a clear message to [him]." (*Id.* at 149:11-12). This is consistent with Kozorosky's testimony that Plaintiff was terminated, in part, because of "[h]er failure to verbalize and agree that she was willing to work with Mr. Cosgrove to be successful in her role after receiving her 90-day probationary evaluation which listed areas where she needed to improve her performance." (Kozorosky Dep. at 6:1-5; ECF No. 72-8).

Plaintiff's attempt to establish pretext by arguing that Select deviated from its written policy by forcing Plaintiff to undergo a 90-day review even though she was not a "newly hired or

re-hired employee" is likewise unavailing. There is no evidence regarding whether employees who change positions within Select, as Plaintiff did when she became a clinical liaison, are typically required to undergo a 90-day review. Without such a baseline for comparison, there is no way in which a jury could find that Select deviated from its policy in this instance in a way suggestive of pretext.

With all of that said, Plaintiff has cast sufficient doubt on the "core facts put forward" by Select in support of its reasons for terminating her to allow her claim to proceed to trial. Again, at bottom, Select claims that Plaintiff was terminated because she simply "was not well suited for the" position. (ECF No. 52 at 4). In support of that claim, Select points to evidence that Plaintiff did not display a "positive energy;" was reluctant to develop relationships with physicians and case managers (or to "break down barriers" and "overcome obstacles") at the hospitals within her region; and "displayed a lack of interest in and commitment to the CL position in that she expressed, on multiple occasions, her preference for case management or other positions that might become available." (*Id.* at 5). According to Select, Plaintiff's lack of commitment was also on display when she purportedly told Cosgrove that the clinical liaison position "isn't [her] dream job" and that she wanted to return to being a case manager if such a position ever opened. In addition, according to Kozorosky, the straw that broke the camel's back was Plaintiff's alleged failure to respond whenever Cosgrove asked whether she wanted to continue in the position.

Viewing the evidence in the light most favorable to Plaintiff, however, the Court finds that there are disputed issues of material fact regarding each of these rationales. First, there is a fact question as to whether Plaintiff actually failed to "break down barriers" as alleged. The only specific instance that any witness could specifically identify in which Plaintiff failed to "break

down barriers" was the incident with Dr. Kumar. Yet Plaintiff has stated that she did, in fact, make efforts to "break down barriers" – just to no avail.

Along those same lines, a factfinder could reasonably determine that Plaintiff's "unsatisfactory" ratings on her 90-day evaluation form, which eventually led to her termination, are indicative of pretext. *See Tomasso*, 445 F.3d at 706 (explaining that "low evaluation scores may be a pretext for discrimination, especially where [. . .] an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees"). The transcript of Cosgrove's deposition is replete with instances in which he could not substantiate the ratings he provided with specific instances of conduct by Plaintiff. He testified, for example, that he rated Plaintiff unsatisfactory in the category of "We treat others as they would like to be treated," but he could only cite the one incident with Kozorosky at the marketing meeting to support his conclusion, and, in any event, he also testified that this issue was resolved after he had a follow-up meeting with Plaintiff about her demeanor in responding to Kozorosky's request. (Cosgrove Dep. 84:13-14; ECF No. 72-5). As another example, Cosgrove could not recall why he rated Plaintiff unsatisfactory in the category "We are results oriented and achieve our objectives." (*Id.* at 18:19). Likewise with respect to the category "Application of sincere effort to learn job and job skills." (*Id.* at 97:9). Indeed, when asked about this category, Cosgrove even agreed with Plaintiff's counsel that she had never "give[n] any evidence that she wasn't doing everything she needed to do to learn the job and job skills." (*Id.* at 98:11-13). All told, then, these ratings "could be discredited by the factfinder simply because [Cosgrove] . . . could not recall with any real detail" why he rated Plaintiff the way that he did. *Marconi v. Moon Area Sch. Dist.*, 104 F. Supp. 3d 686, 703 (W.D. Pa. 2015) (citing *Hendricks v. Pitt. Pub. Schs.*, 2015 WL 540030, at \*7 (W.D. Pa. Feb. 10, 2015); *Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir. 1997)).

Plaintiff has also called into question the "core facts" underlying Select's "lack-of-commitment" rationale. In particular, there is a dispute whether Plaintiff ever told Cosgrove that the clinical liaison position "isn't [her] dream job" and whether Plaintiff failed to answer Cosgrove when he asked her whether she remained committed to the position after her 90-day review. Plaintiff's testimony that she would do the job to the best of her ability, even though it was not her first choice, also creates a fact question as to whether she was committed to the job. *See, e.g.*, *Tomasso*, 445 F.3d at 708 (finding that where employer terminated employee in part because he seemed uninterested in a new project, but employee introduced evidence that he actually was interested in the project, summary judgment was not warranted).

The Court recognizes that "[b]arring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions." *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled in part on other grounds*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). It is also true that courts may "not second guess the method an employer uses to evaluate its employees." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir.1998) ("Whether sales quotas or evaluation scores are a more appropriate measure of a manager's performance is not for the court (or factfinder) to decide.")). Be that as it may, because Plaintiff has "come forward with sufficient evidence to allow a finder of fact to discredit [Select's] proffered justification" for her termination, *Burton*, 707 F.3d at 427, the Court must deny Select's motion for summary judgment as to Plaintiff's ADEA claim. Since the same analysis governs both the ADEA and PHRA claims, summary judgment must also be denied as to the PHRA claim against Select. *Connors*, 160 F.3d at 972. Furthermore, because Cosgrove has not raised any independent basis

for granting summary judgment as to the PHRA claim against him in his individual capacity, the

Court must deny his motion for summary judgment, as well.

## V.      **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 51) will

be denied. An appropriate Order will follow.


                                             s/ *Nora Barry Fischer*
                                             Nora Barry Fischer
                                             United States District Judge

Date: November 22, 2016
cc/ecf: All counsel of record